LIU, J.,
Concurring and Dissenting. — Since the United States Supreme Court authorized reinstatement of the death penalty in 1976, the ultimate punishment has been governed by the principle that its imposition must be rationally guided by law, not left to the sentencer’s unfettered discretion. Accordingly, the test for whether an individual is qualified to serve on a capital jury is whether he or she can faithfully apply the law in accordance with instructions given by the court. Neither strong support for the death penalty nor strong opposition to it is by itself disqualifying. The crucial inquiry is whether prospective jurors can set aside their personal views on the death penalty and follow the law.
This inquiry is not one that most people have thought much about. Most people never have reason to confront such a question apart from the rare circumstance of being evaluated for jury service in an actual death penalty case. When ordinary people are put in that situation, it may be the first time that they are being asked — under oath, by a person of authority, in a proceeding that really matters — to state their views on the death penalty and to consider whether their views should yield to their sense of civic duty or allegiance to the law.
Unsurprisingly, quite a few people do not find the question to be an easy one, and trial courts face the necessary but “difficult task of distinguishing between prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial.” (Wainwright v. Witt (1985) 469 U.S. 412, 421 [83 L.Ed.2d 841, 105 S.Ct. 844] (Witt).) An adequate evaluation of each prospective juror’s ability to follow the law is thus essential to selecting a fair jury, and the erroneous disqualification of even a single prospective juror requires reversal of the death judgment. (See Gray v. Mississippi (1987) 481 U.S. 648, 659-668 [95 L.Ed.2d 622, 107 S.Ct. 2045]; People v. Riccardi (2012) 54 Cal.4th 758, 783 [144 Cal.Rptr.3d 84, 281 P.3d 1] (Riccardi).)
*889 Today’s opinion says a reliable answer to this all-important inquiry may be gleaned from one-word answers given by prospective jurors in response to a single question, bereft of any mention of the law or the proper role of jurors in a capital trial. I disagree. In this case, the trial court excused 16 prospective jurors on the basis of a single question that could have been — and, in fact, was — understood by some jurors to ask only about their personal views on the death penalty, not whether they could set aside their personal views and follow the law. Because the trial court lacked an adequate basis for disqualifying these jurors, the jury that sentenced defendant to death was not properly selected. Accordingly, I dissent from today’s affirmance of the death judgment.
I.
For nearly four decades, the constitutionality of the death penalty has rested on the principle that its imposition must reflect a determination of culpability by the sentencing authority that is “reasoned” and “rational,” not “capricious or arbitrary.” (Gregg v. Georgia (1976) 428 U.S. 153, 190-195 [49 L.Ed.2d 859, 96 S.Ct. 2909] (Opn. of Stewart, J., joined by Powell & Stevens, JJ.); see Pulley v. Harris (1984) 465 U.S. 37, 54 [79 L.Ed.2d 29, 104 S.Ct. 871] [upholding California’s reinstatement of the death penalty in 1977]; People v. Tuilaepa (1992) 4 Cal.4th 569, 595 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) Although the sentencer must have discretion to consider all relevant information concerning the defendant and the crime (see Woodson v. North Carolina (1976) 428 U.S. 280 [49 L.Ed.2d 944, 96 S.Ct. 2978]), it is imperative that this discretion be “channeled” and “circumscribed by . . . legislative guidelines.” (Gregg, at pp. 206-207.) Such guidelines are important “especially if sentencing is performed by a jury.” (Id. at p. 192.) “Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given.” (Ibid.) In order to prevent juries from “wantonly and freakishly imposing] the death sentence” (id. at p. 207), they must “be carefully and adequately guided in their deliberations” (id. at p. 193). In short, a capital jury must make its sentencing decision in accordance with law, not “untrammeled discretion.” (Gregg, at p. 195, fn. 47; see Furman v. Georgia (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726].)
From this principle, it follows that eligibility to serve as a juror in a capital case does not turn dispositively on whether a person supports or opposes the death penalty. In capital cases, “as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts.” (Witt, supra, 469 U.S. at p. 423.) The ultimate test, as set forth in Witt, is not what a prospective juror thinks of the death penalty but “whether the juror’s views would ‘prevent or substantially impair the performance of his duties as a juror in accordance *890 with his instructions and his oath.’ ” (Id. at p. 424.) Citizens called to jury service are asked to assume the role of an impartial decisionmaker, and the high court has long recognized that “ ‘[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State ....’” (Uttecht v. Brown (2007) 551 U.S. 1, 6 [167 L.Ed.2d 1014, 127 S.Ct. 2218] (Uttecht), quoting Witherspoon v. Illinois (1968) 391 U.S. 510, 519 [20 L.Ed.2d 776, 88 S.Ct. 1770] (Witherspoon).) “It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.” (Lockhart v. McCree (1986) 476 U.S. 162, 176 [90 L.Ed.2d 137, 106 S.Ct. 1758] (Lockhart).) “[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.” (Witherspoon, at p. 522.) The crucial question is whether prospective jurors who oppose the death penalty are willing and able to set aside their personal beliefs and conscientiously apply the law. (Witt, at p. 421.)
In conducting this inquiry, trial courts must take a practical approach to assessing a prospective juror’s fitness to serve. “[Determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.” (Witt, supra, 469 U.S. at p. 424.) In evaluating a prospective juror’s answers to voir dire questions, courts must focus on how the questions “might be understood — or misunderstood — by prospective jurors,” not on “how the phrases employed in this area have been construed by courts and commentators.” (Witherspoon, supra, 391 U.S. at p. 515, fn. 9.) Further, the Witt standard “does not require that a juror’s bias be proved with ‘unmistakable clarity.’ ” (Witt, at p. 424.) “[M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made ‘unmistakably clear ...,’” even when “the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.” (Id. at pp. 424-425, 426.) On appellate review, we defer to the trial court’s ruling when it is aided by an assessment of the prospective juror’s demeanor. (See People v. Whalen (2013) 56 Cal.4th 1, 26 [152 Cal.Rptr.3d 673, 294 P.3d 915] (Whalen).)
The high court applied these principles in Darden v. Wainwright (1986) 477 U.S. 168 [91 L.Ed.2d 144, 106 S.Ct. 2464] (Darden). There the trial court asked a prospective juror named Murphy, “ ‘Do you have any moral or religious, conscientious moral or religious principles in opposition to the death penalty so strong that you would be unable without violating your own principles to vote to recommend a death penalty regardless of the facts?’ ” (Id. *891 at p. 178.) Murphy, who had worked at a Catholic seminary, responded, “ ‘Yes, I have and on that basis, he was excused. (Ibid.)
In upholding the trial court’s ruling, the high court said: “The precise wording of the question asked of Murphy, and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstance recommend the death penalty.” (Darden, supra, 477 U.S. at p. 178.) Instead, Darden looked to “the context surrounding Murphy’s exclusion to determine whether the trial court’s decision that Murphy’s beliefs would ‘substantially impair the performance of his duties as a juror’ was fairly supported by the record.” (Id. at p. 176.)
The crucial context in Darden was that “[djuring voir dire, but prior to individual questioning on this point, the trial court spoke to the entire venire . . . saying: [(J[] ‘Now I am going to ask each of you individually the same question so listen to me carefully, I want to know if any of you have such strong religious, moral or conscientious principles in opposition to the death penalty that you would be unwilling to vote to return an advisory sentence recommending the death sentence even though the facts presented to you should be such as under the law would require that recommendation? Do you understand my question?’ ” (Darden, supra, 477 U.S. at p. 176, second italics added.) Murphy was present in the courtroom when the trial court “repeatedly” asked this more detailed and correct formulation of the question to other prospective jurors. (Id. at pp. 176-177; see id. at p. 177, fn. 3 [trial court further asked one juror: “ ‘[I]n the event that the evidence should be such that under the law that should be the legal recommendation you would be unwilling to return such a recommendation because of your conscientious beliefs?’ ”].) Thus, by the time the trial court questioned Murphy, he had been “present throughout an entire series of questions that made the purpose and meaning of the Witt inquiry absolutely clear.” (Id. at p. 178.) In addition, the high court explained, “[n]o specific objection was made to the excusai of Murphy by defense counsel. Nor did the court perceive, as it had previously [with other prospective jurors], any need to question further. Viewing the record of voir dire in its entirety, we agree . . . that the trial court’s decision to exclude this juror was proper.” (Ibid.)
Thus, Darden held that Murphy’s answer to the single question posed to him was not adequate by itself to justify excusing him for cause. But the record as a whole showed that Murphy would have understood that the trial court was asking whether he was willing to follow the law despite being personally opposed to the death penalty, and the trial court was entitled to interpret his answer accordingly. (Darden, supra, 477 U.S. at p. 178; see Uttecht, supra, 551 U.S. at p. 13 [“The transcript of Juror Z’s questioning reveals that, despite the preceding instructions and information, he had both *892 serious misunderstandings about his responsibility as a juror and an attitude toward capital punishment that could have prevented him from returning a death sentence under the facts of this case.” (italics added)].)
II.
The case before us presents the converse of Darden: Here the trial court excused 16 prospective jurors on the basis of their answers to a single question without any indication that those jurors understood the question to be asking whether they were “willing to temporarily set aside their own beliefs in deference to the rule of law.” (Lockhart, supra, 476 U.S. at p. 176.) In fact, the record contains affirmative proof that at least some prospective jurors did not understand the question to adequately probe whether their views on the death penalty were so unyielding as to substantially impair their performance as jurors in conformity with the law.
In assessing the qualifications of prospective jurors, the trial court used a two-step process. First, prospective jurors underwent an initial group screening before being asked to fill out written questionnaires. Then, after filling out the questionnaires and being instructed on the law and procedure governing capital sentencing trials, the jurors were subject to individualized voir dire led primarily by the attorneys. The venire was divided into four panels, and the trial court used the same procedure with each panel. The first and second panels were screened on Friday, October 10, 1997; the third and fourth panels were screened on Tuesday, October 14, 1997. In addition to summarizing the process here, I have reprinted the transcript of the screening process for each panel in an appendix to this opinion. Before going further, the reader may wish to read the transcript in order to see exactly what the trial court did. As explained below, the precise sequence of events — in particular, the difference between the trial court’s approach to the October 10 panels and its approach to the October 14 panels — is critical to understanding what went wrong in this case.
After the first panel was sworn in, the trial court told the prospective jurors that this was a capital case and that “[i]f the jury in this case finds [defendant] guilty of murder in the first degree, and further finds that the special circumstances allegation is true, the jury in this case will be asked to determine the penalty in this case. [¶] The jury will have two options, and two options only, and that will be life without the possibility of parole, that will be life in prison, or death.” The trial court later gave the same information to the second panel and added: “Now, people do tend to have strong opinions when it comes to the death penalty, and people are certainly entitled to have those opinions, and no such opinion is right or wrong, but we do need to find out what your feeling is in general on the death penalty before *893 we can proceed any further, so I’m going to ask you first the following couple of very general questions.” The court gave similar introductory remarks to the third and fourth panels.
After this brief introduction, the court began its screening of each panel by asking the following question, which I will refer to as the initial screening question: “Because of your feelings about the death penalty in general, is there anyone who would be unable to vote to impose the punishment of death in this case or in any case, regardless of the evidence? [¶] If the answer is yes, if you’d rise.” (This is what the trial court said to the second panel. The version that the court posed to the first and fourth panels did not include the words “in general,” and the version posed to the first panel did not include the words “or in any case.”)
Up to that point in the screening of each panel, the trial court had not given the prospective jurors any information about the legal framework that governs the death penalty in California. It had not explained that capital trials are bifurcated into a guilt phase and penalty phase, and that the jury at the penalty phase determines the appropriate sentence only after the parties have had the opportunity to present mitigating and aggravating evidence about the defendant and his crime. (Pen. Code, §§ 190.1, 190.3; all undesignated statutory references are to this code.) Nor had it explained that state law authorizes a death sentence only if the jury “concludes that the aggravating circumstances outweigh the mitigating circumstances.” (§ 190.3.) In other words, before answering the initial screening question, the prospective jurors had not been informed that a capital jury decides on punishment in a proceeding separate from its determination of the defendant’s guilt, that a jury chooses between death and a life sentence only after the parties have the opportunity to present new evidence not presented at the guilt phase, or that the law structures the jury’s decision by setting forth relevant aggravating and mitigating factors, and by requiring the jury to find that aggravating circumstances outweigh mitigating circumstances before imposing a sentence of death. In addition, the trial court never mentioned that the duty of jurors is to follow the law notwithstanding their personal views on the death penalty.
Ten prospective jurors on the first panel rose in response to the initial screening question. The court proceeded to ask essentially the same question or a portion of the question to each juror individually. For example, the court asked Prospective Juror T.L., “[Y]ou would be unable to vote to impose the punishment of death in this case, regardless of the evidence?” And the court asked Prospective Jurors C.M. and S.C., “[Tjhat is regardless of what the evidence is; is that correct?” The court excused nine of the 10 prospective jurors after they answered “Yes,” “Right,” “Correct,” or “That is correct” to such questions. The 10th prospective juror, K.O., was dismissed after saying, *894 “Yes. I just don’t believe in the death penalty.” Defendant objected after the first two prospective jurors were dismissed, and the court overruled the objection. After these 10 prospective jurors were dismissed, the court distributed written questionnaires to the remaining panel members.
The court repeated this process with the second panel. This time, six prospective jurors rose in response to the court’s initial screening question. Again, the court asked essentially the same question or a portion of it to each juror individually, and after answering, each was dismissed. After the first prospective juror was dismissed, the court asked defense counsel, “I assume you’re making the same objection as before?” When counsel responded in the affirmative, the objection was overruled. Only one of the six prospective jurors, A.W., said more than “Yes” or “That is correct” in response to individual questioning. Before the court could question A.W., she said, “I just don’t believe — .” The court interrupted to ask her name. After hearing her name, the court asked, “And Miss [W.], you would be unable to impose the death penalty in this case or any case, regardless of the evidence; is that correct?” A.W. answered, “Yes,” and she was dismissed. The court then distributed questionnaires to the remaining panel members.
The court allowed voir dire of the remaining prospective jurors from the first two panels after they had filled out their questionnaires. Before doing so, the court explained to those jurors the bifurcated nature of capital proceedings. It also explained that at the penalty phase “the jury will then be given the opportunity to consider additional information, and the jury will be guided by the application of certain principles of law, which I will now read to you.” The court then read the statutory aggravating and mitigating factors that a penalty phase jury must consider if relevant, and it explained that the weighing of these factors “does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them.” It also explained that “to return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that they warrant death instead of life without parole.”
The first two panels did not yield a sufficient number of prospective jurors, so the court summoned more prospective jurors four days later. The court repeated the screening process with two additional panels. As before, the court began by asking the same initial screening question. Six prospective jurors on the third panel stood up in response. At the start of each individual colloquy, however, each of these jurors summarized his or her death penalty views before the court asked any questions. Then, in the case of all the jurors except Prospective Juror G.L., the court posed questions that differed from the initial screening question. The court asked Prospective Juror J.L., “There *895 is no possible case that you would vote to impose the death penalty on?” The court asked Prospective Jurors L.W., R.C., N.H., and E.S. the following (or substantially the same) question: “You could not even conceive of an instance where you would vote to impose the death penalty?” The court also asked Prospective Juror N.H., “Have you given this subject any thought before right now?” All six prospective jurors provided more than one-word answers in describing their death penalty views, and several gave quite specific explanations. As a result of this more attentive screening process, the court did not dismiss the sixth prospective juror, E.S., who expressed some confusing views. E.S. was the first prospective juror not dismissed after standing in response to the court’s initial screening question. E.S. went on to fill out a questionnaire, underwent voir dire by the parties, and ultimately survived a challenge for cause.
The court used a similar procedure to screen the fourth panel. Three prospective jurors rose in response to the initial screening question. After being questioned in a manner similar to the third panel, only one of the three, A.M., was dismissed. Prospective Juror E.B. initially told the court that he “could not participate in a jury that would be asked to impose death in any case.” The court asked further, “So you could not conceive of a case where the death penalty might be appropriate?” E.B. replied, “I could conceive — I could conceive of a case, but I don’t know that I’d want — I—I don’t know that I would want to be part of that case.” Based on this response, the court decided that E.B. needed to fill out a questionnaire. A similar colloquy ensued with Prospective Juror L.T., who initially said, “I would not like to be the one to decide on taking a person’s life.” The court asked, “So you would not want to participate?” L.T. replied, “No.” The court then asked, “Could you conceive of a case that would be so horrendous that you would vote to impose the death penalty?” L.T. replied, “Yes.” Finally, the court asked, “So depending on the circumstances or the evidence, you might be willing to vote to impose it?” L.T. replied, “Yes.” At that point, the court decided that she too needed to fill out a questionnaire. Eventually, after full voir dire, E.B. was not challenged for cause, and the defense stipulated to L.T.’s dismissal.
As with the first two panels, the court provided a detailed explanation of capital sentencing law and procedure to the remaining prospective jurors from the third and fourth panels after they had filled out their questionnaires and before full voir dire began.
In describing the trial court’s questioning of prospective jurors who stood up in response to the initial screening question, today’s opinion says, “Some *896 of these colloquies were more extensive than others, and on three occasions when there was ambiguity in the prospective juror’s response the trial court did not excuse the individual.” (Maj. opn., ante, at p. 855; see id. at p. 857.) That is true, but it elides a crucial fact: The only colloquies that were more extensive occurred during the court’s questioning of the third and fourth panels. Almost all of the colloquies with prospective jurors on the two October 14 panels were more detailed than any of the colloquies with prospective jurors on the two October 10 panels. And it is no accident that three of the nine prospective jurors who stood up on October 14 in response to the court’s initial screening question were retained, whereas none of the 16 prospective jurors who stood up on October 10 was retained. These important differences between the October 10 panels and the October 14 panels, which go unmentioned in today’s opinion, are summarized here:
[[Image here]]
III.
In assessing the trial court’s screening process, I begin by discussing the proper standard of review. I then show that the October 10 screening process did not adequately probe the crucial question under Witt: whether a prospective juror’s death penalty views would substantially impair his or her performance as a juror in accordance with the law. The inadequacy of the screening process, I explain, is confirmed by precedents of this court and others.
A.
Although a trial court’s excusai of a prospective juror for cause is typically afforded deference on appeal, there is no basis for deference to the trial court’s excusai of the 16 prospective jurors from the two October 10 panels. Deference is warranted where a finding of substantial impairment “is based upon determinations of demeanor and credibility that are peculiarly within a *897 trial judge’s province.” (Witt, supra, 469 U.S. at p. 428; see Whalen, supra, 56 Cal.4th at p. 26 [deference is appropriate because the trial judge is in a position to hear “ 1 “the person’s tone of voice, apparent level of confidence, and demeanor” ’ ”].) “But such deference is unwarranted when ... the trial court’s ruling is based solely on the ‘cold record’ of prospective jurors’ answers on a written questionnaire, the same information that is available on appeal.” (People v. Avila (2006) 38 Cal.4th 491, 529 [43 Cal.Rptr.3d 1, 133 P.3d 1076] (Avila); see People v. McKinnon (2011) 52 Cal.4th 610, 647 [130 Cal.Rptr.3d 590, 259 P.3d 1186] (McKinnon); People v. Stewart (2004) 33 Cal.4th 425, 451 [15 Cal.Rptr.3d 656, 93 P.3d 271] {Stewart).) By the same token, deference is unwarranted where, as here, the trial court’s rulings were based on nothing more than seeing prospective jurors stand up as a scattered group in a courtroom full of other prospective jurors in response to an initial screening question, and then hearing those jurors utter one-word responses to substantively identical leading questions.
Recall that the trial court, in questioning each prospective juror who stood up on October 10, simply repeated the initial screening question or a portion of it: “[T]hat is regardless of the evidence; is that correct?” “Your answer is that you would be unable to vote to impose the penalty of death, regardless of the evidence?” “And that would be in any case; is that correct?” Fourteen of the 16 jurors were excused after saying nothing more than “Yes,” “Right,” or “Correct” in response to such questions. Prospective Juror K.O. said, “I just don’t believe in the death penalty,” and the court did not inquire further. When Prospective Juror A.W. tried to explain her views by saying, “I just don’t believe — the trial court interrupted her and continued with the same questioning. In light of the rote and rapid process by which the trial court excused the 16 prospective jurors from the two October 10 panels, it strains credulity to suggest that the trial court based its rulings on an evaluation of “their credibility and their conviction.” (Maj. opn., ante, at p. 858.)
Noting that “the court asked more questions of some jurors and fewer of others,” the Attorney General contends that “the presumptive explanation for the difference in questioning lies in the demeanor of the jurors and the tone of their responses.” Today’s opinion makes a similar argument. (Maj. opn., ante, at pp. 857-858.) But the trial court did not simply ask more questions of some jurors and fewer of others. More precisely, the record shows a clear pattern: The court asked more questions in screening the prospective jurors who stood up on October 14 than it asked those who stood up on October 10. And whereas the court asked none of the 16 prospective jurors who stood up on October 10 any questions materially different from the initial screening question, it asked eight of the nine prospective jurors who stood up on October 14 at least one question, and sometimes several questions, different from the initial screening question. Demeanor cannot explain this pattern of disparate questioning unless one posits, implausibly, that all the prospective *898 jurors who stood up on October 10 did so in a more resolute manner or uttered “Yes,” “Right,” or “Correct” more forcefully than almost all the prospective jurors who stood up on October 14. Isn’t the more natural inference that the trial court, having had four days between October 10 and October 14 to reflect on its approach to voir dire, decided it was advisable to conduct more detailed voir dire of the latter two panels? Further, although it is true that the trial court did not excuse three prospective jurors who gave confusing or ambiguous answers (id. at p. 858), the key fact is that all three jurors gave such answers in response to the court’s different approach to individual questioning on October 14. By contrast, when the court essentially parroted the initial screening question to individual jurors on October 10, almost every one of the 16 jurors questioned was excused on the basis of one-word answers. (Because seeing is believing, I again refer the reader to the full transcript in the appendix.)
On this record, deference may well be appropriate in reviewing the trial court’s dismissal of six prospective jurors from the October 14 panels. But no deference is owed to its excusai of the 16 prospective jurors from the October 10 panels. There is not the slightest hint that the trial court considered the demeanor of those jurors, which explains why today’s opinion must resort to the truism, applicable to every case on appeal, that “the trial court was present at the voir dire and we were not.” (Maj. opn., ante, at p. 860.) The trial court was present, but instead of using a screening process from which it could “ ‘glean[] valuable information that simply does not appear on the record,’ ” it relied on “the same information that is available on appeal” in excusing those 16 prospective jurors. (Avila, supra, 38 Cal.4th at p. 529.) Accordingly, the question on appeal is whether the record reflects “ ‘sufficient information ... to permit a reliable determination’ that the juror’s death penalty views ‘would “ ‘prevent or substantially impair’ ” the performance of his or her duties (as defined by the court’s instructions and the juror’s oath) ....’” (McKinnon, supra, 52 Cal.4th at p. 648.) Under this “quite exacting” standard (ibid,.), the trial court’s minimal screening of the 16 prospective jurors excused on October 10 does not suffice.
B.
For several reasons, it is unlikely that prospective jurors understood the trial court’s initial screening question to be asking whether they would be willing to set aside their personal opposition to the death penalty and follow the law.
The initial screening question posed to the first October 10 panel asked whether any prospective jurors had “feelings about the death penalty” that would make them unable to vote to impose death. Similarly, the initial *899 screening question posed to the second October 10 panel asked whether anyone would be unable to vote to impose death “[b]ecause of your feelings about the death penalty in general.” On a commonsense understanding, these questions invited prospective jurors to examine their “feelings” about capital punishment, not to consider any countervailing allegiance they might have to the rule of law or the duty of citizens to impartially apply the law when serving as jurors.
This problem is especially apparent with respect to the second October 10 panel, where the trial court prefaced its initial screening question by saying, “Now, people do tend to have strong opinions when it comes to the death penalty, and people are certainly entitled to have those opinions, and no such opinion is right or wrong, but we do need to find out what your feeling is in general on the death penalty before we can proceed any further, so I’m going to ask you first the following couple of very general questions.” (Italics added.) This comment, as well as the actual wording of the initial screening question posed to the second October 10 panel, informed prospective jurors that the court sought to probe their “general” feelings about the death penalty, not the specific issue of whether they could set aside their feelings in deference to the rule of law.
Moreover, it is particularly significant that the trial court, before questioning the prospective jurors, never informed them that the law provides a framework for deciding on the penalty in a capital case. Without such instruction, the prospective jurors had no reason or informed basis to consider whether they were so wedded to their personal views on the death penalty that they could not faithfully apply the law. Although it is true that many people have strong views on the death penalty in general, it is also true that most people think of themselves as dutiful and law abiding. One may well conclude, as in Darden and other cases (see post, at p. 904), that a prospective juror has decided her personal views would impair her ability to follow the law if she says she cannot vote for the death penalty after having been told what the law requires. But it is not realistic to think that the initial screening question here would have prompted prospective jurors, without any instruction on the law, to focus on how they would resolve any conflict between personal opposition to the death penalty and adherence to the law — a question most prospective jurors are unlikely to have considered before.
This last point illuminates the limited significance of the trial court’s inquiry into whether prospective jurors would be “unable” to vote for death “regardless of the evidence.” As noted, the high court in Darden upheld the dismissal of a juror based on his affirmative answer to a single question only after concluding that the juror “was present throughout an entire series of questions” — including questions that referred to what the law required — “that *900 made the purpose and meaning of the Witt inquiry absolutely clear.” (Darden, supra, 477 U.S. at p. 178.) The context here could not be more different: The trial court did not say anything about what the law required before asking the initial screening question. In addition, defense counsel here, unlike in Darden (see ibid.), did object to the excusai of prospective jurors during the October 10 screening process, and the trial court here, unlike in Darden (see ibid.), did not distinguish among the 16 jurors dismissed on October 10 by asking some of them, but not others, further questions distinct from the initial screening question.
Even if some prospective jurors had understood the initial screening question to ask whether they could set aside their personal beliefs and follow the law, we still could not presume that the phrase “regardless of the evidence” adequately conveyed what the law requires. Without instruction as to the existence or nature of a separate penalty phase in a capital trial, many prospective jurors would have no basis to properly understand what “evidence” the court was referring to. A layperson, unschooled in death penalty law, may well assume that after finding a capital defendant guilty, the jury must decide on the penalty without hearing additional evidence. Such a person could reasonably understand the phrase “regardless of the evidence” to mean regardless of the evidence of guilt. (See Witherspoon, supra, 391 U.S. at p. 515, fn. 9 [“What matters is how [the phrase] might be understood — or misunderstood — by prospective jurors.”].) But a person who is unable to impose the death penalty no matter how strong the evidence of guilt is not necessarily a person who would be unable to impose the death penalty after a separate trial in which the parties have had a fair opportunity to present aggravating and mitigating evidence. A person may reasonably believe it is unfair to impose the death penalty based on evidence that the defendant committed a horrible crime, however damning the evidence may be, yet also believe it can be fair to impose the death penalty after having had a chance to consider relevant facts about the defendant’s life, upbringing, and possible impairments. Because the trial court never explained the nature of a penalty trial before asking the initial screening question, it is entirely plausible, even likely, that one or more prospective jurors answered the question without an accurate understanding of what evidence may properly inform the penalty decision. (See Carter v. Kentucky (1981) 450 U.S. 288, 302 [67 L.Ed.2d 241, 101 S.Ct. 1112] [“Jurors are not experts in legal principles; to function effectively, and justly, they must be accurately instructed in the law.”].)
Of course, we do not know what the 16 prospective jurors excused from the October 10 panels were actually thinking when they answered the initial screening question. That is because the trial court did not ask, and it appeared disinterested in anything more than one-word answers to its rote questioning. But were there any doubt that the initial screening question did not adequately probe whether prospective jurors could follow the law, we have in *901 this case a built-in comparison group: the prospective jurors who stood up in response to the initial screening question on October 14 and then — unlike the 16 jurors dismissed on October 10 — answered additional, different questions posed by the court to each juror individually. As it turns out, the initial screening question was insufficient to disqualify one-third of those nine jurors: the court did not excuse E.S., E.B., or L.T. Had the court questioned them in the same rote way it had questioned the 16 prospective jurors on October 10, in all likelihood they would have been dismissed. But the court took a different approach to questioning the prospective jurors who stood up on October 14, and the court’s exchanges with E.S., E.B., and L.T. demonstrate the inadequacy of the October 10 process.
As noted, E.B. initially said, “I could not participate in a jury that would be asked to impose death in any case.” But in response to further questioning by the court, E.B. said he “could conceive of a case [where the death penalty might be appropriate], but I don’t know that I’d want — I—I don’t know that I would want to be part of that case.” On that basis, E.B. survived screening. He filled out a questionnaire and heard the court’s instmctions on the law that governs capital sentencing proceedings. Then, during full voir dire, the court reminded E.B. that he had originally expressed opposition to the death penalty. E.B. explained, “when I came into, you know, the audience, as you put it, I wasn’t expecting, you know, such issues at that time. [][] But having time to look at the questionnaire and read the questions, and understanding and following the judge’s instructions, I still have an uneasy feeling, but I feel I could perform the job as a juror, basing my decision on the evidence only and on the law as instructed by the judge.” (Italics added.) In light of this exchange, E.B. was not challenged for cause.
Similarly, L.T. initially said she “would not like to be the one to decide on taking a person’s life” and agreed with the court that “[she] would not want to participate.” But when the court pressed her a little more, L.T. agreed with the court that she could “conceive of a case that would be so horrendous that [she] would vote to impose the death penalty” and that “depending on the circumstances or the evidence, [she] might be willing to vote to impose it.” On that basis, the court decided she should not be excused at the screening phase.
E.S. initially agreed with the court that she “couldn’t conceive of any instance where [she] would vote to impose the death penalty,” citing her religion. But the court went on to ask a series of questions that prompted E.S. to give some confusing answers. On that basis, the court decided that E.S. should fill out a questionnaire and receive instruction on the law. During full voir dire, the prosecutor said to E.S., “You said that you just don’t believe in the death penalty in your questionnaire. [][] Is that your honest opinion as you *902 sit here today?” E.S. replied, “Yes.” The prosecutor then asked E.S. about her answers to the court’s screening questions. She responded, “I forgot what I said. I was so nervous.” After further questioning, the prosecutor ultimately asked, “[D]o you really, honestly believe that you could make that decision and vote for death, if we got to that point in this trial, and under the facts and the law it was appropriate?” (Italics added.) E.S. replied, “I’ll say yes, yes.” When the prosecutor subsequently challenged E.S. for cause, the court overruled the challenge, saying to the prosecutor, “Well, I think you did a pretty good job of rehabilitating her
These exchanges show that with only a bit of additional probing, prospective jurors who claim they are “unable” to vote for the death penalty “regardless of the evidence” may reveal that they do not actually hold such an absolute position. In addition, the voir dire answers given by E.B. and E.S. after they filled out the questionnaire and received instruction on the law show that prospective jurors who answered the initial screening question in the affirmative may have been able nonetheless to set aside their personal opposition to the death penalty and apply the law.
What happened with E.B. and E.S. is consistent with what occurs in many capital cases: Prospective jurors who give apparently disqualifying answers during voir dire or on a written questionnaire are often rehabilitated after being instructed that the law requires jurors to set aside their personal beliefs. Courts have certainly found this to be true of jurors who firmly believe that all murderers should get the death penalty or that the biblical principle of “an eye for an eye” should dictate punishment. (See, e.g., Whalen, supra, 56 Cal.4th at pp. 31-36; People v. Martinez (2009) 47 Cal.4th 399, 442, 445 [97 Cal.Rptr.3d 732, 213 P.3d 77]; People v. Crittenden (1994) 9 Cal.4th 83, 122-123 [36 Cal.Rptr.2d 474, 885 P.2d 887]; Miles v. State (Ala.Crim.App. 1997) 715 So. 2d 913, 919; Manley v. State (Del. 1998) 709 A.2d 643, 655-656; Barnhill v. State (Fla. 2002) 834 So. 2d 836, 844-845; People v. Buss (1999) 187 Ill.2d 144 [718 N.E.2d 1, 27-28, 240 Ill. Dec. 520]; Young v. Commonwealth (Ky. 2001) 50 S.W.3d 148, 164; State v. Juniors (La. 2005) 915 So. 2d 291, 310-313; Walker v. State (Miss. 1995) 671 So. 2d 581, 624-626; State v. Quesinberry (1987) 319 N.C. 228 [354 S.E.2d 446, 450-451]; State v. Roberts (2006) 110 Ohio St.3d 71 [2006 Ohio 3665, 850 N.E.2d 1168, 1180-1181]; Eizember v. State (2007) 2007 OK CR 29 [164 P.3d 208, 223-226]; State v. Barone (1998) 328 Ore. 68 [969 P.2d 1013, 1020-1022]; Cordova v. State (Tex.Crim.App. 1987) 733 S.W.2d 175, 183-184.) There is no reason to think that jurors who oppose the death penalty are any less capable of setting aside their personal views after being instructed on the law. (See Uttecht, supra, 551 U.S. at p. 6; Lockhart, supra, 476 U.S. at p. 176.)
Indeed, not everyone who opposes the death penalty opposes it on the uncompromising ground that it is always wrong for the state to take a human *903 life. Many people oppose it on more limited grounds; they may believe that the death penalty is applied unfairly, that it is ineffective as a deterrent to crime, or that it costs too much money to administer. Such beliefs may induce opposition to the death penalty in general, regardless of the evidence in a particular case. But when instructed on the law and pressed to weigh one’s personal views against one’s civic duty, opponents of the death penalty no less than its proponents may be willing to temporarily set aside their personal views. They may do so because a proper understanding of the law allays their concerns or because instruction by a judge in a solemn proceeding impresses upon them that fair adjudication of a particular case requires impartiality and fidelity to the law. Here the trial court prematurely excused 16 prospective jurors without an adequate examination of their views.
C.
In reaching a contrary conclusion, today’s opinion relies on Riccardi, supra, 54 Cal.4th 758, and Avila, supra, 38 Cal.4th 491, and distinguishes Stewart, supra, 33 Cal.4th 425, and People v. Heard (2003) 31 Cal.4th 946 [4 Cal.Rptr.3d 131, 75 P.3d 53] (Heard). (Maj. opn., ante, at pp. 856-859.) Because our case law in this area is necessarily fact intensive, it is difficult to say that any one case squarely dictates the answer here. Nevertheless, one thing is clear: We have never upheld the excusai of a prospective juror for cause solely based on a one-word answer to a single, isolated question that asked whether the juror would be “unable” to impose the death penalty “regardless of the evidence.” Where we have found the answer to such a question disqualifying, it has been in contexts where prospective jurors insisted on adhering to their personal views in the face of additional information clearly stating that jurors have a duty to set aside their personal views and follow the law.
In Heard, the prosecution challenged a prospective juror because he wrote in his questionnaire that he considered life without parole a more severe penalty than death. (Heard, supra, 31 Cal.4th at pp. 963-964.) Upon being informed during voir dire that the law required jurors to treat the death penalty as the more severe sentence, the juror said he would do “ ‘whatever the law states.’ ” (Id. at p. 964.) Still, the trial court excused the juror for cause. We said: “In view of [the prospective juror’s] clarification of his views during voir dire, we conclude that his earlier juror questionnaire response, given without the benefit of the trial court’s explanation of the governing legal principles, does not provide an adequate basis to support [his] excusai for cause.” (Ibid., original italics.)
In Stewart, the trial court excused five prospective jurors for cause based solely on their written answers to a questionnaire item that asked, “ ‘Do you *904 have a conscientious opinion or belief about the death penalty which would prevent or make it very difficult for you ...[][]... [][] . . . [t]o ever vote to impose the death penalty?’ ” (Stewart, supra, 33 Cal.4th at pp. 442-443.) That question was the only item on the questionnaire that asked prospective jurors their views on the death penalty. (Id. at p. 442.) Each of the five dismissed jurors answered “yes” and added one of the following comments: “ T do not believe a person should take a person’s life. I do believe in life without parole.’ ” “ T am opposed to the death penalty.’ ” “ T do not believe in capit[a]l punishment.’ ” “ ‘In the past, I supported legislation banning the death penalty.’ ” “ T don’t believe in irreversible penalties. A prisoner can be released if new information is found.’ ” (Id. at pp. 444-445.)
We first explained that the single item on the questionnaire was inadequate because it asked prospective jurors only whether they would find it “very difficult” to vote for a death sentence. “[A] prospective juror who simply would find it ‘very difficult’ ever to impose the death penalty, is entitled— indeed, duty bound — to sit on a capital jury, unless his or her personal views actually would prevent or substantially impair the performance of his or her duties as a juror.” (Stewart, supra, 33 Cal.4th at p. 446.)
We then addressed the prospective jurors’ written comments. In discussing the prospective juror who wrote that he did not believe in taking a person’s life, we said; “Absent clarifying follow-up examination by the court or counsel. . . — during which the court would be able to further explain the role of jurors in the judicial system, examine the prospective juror’s demeanor, and make an assessment of that person’s ability to weigh a death penalty decision — the bare written response was not by itself, or considered in conjunction with the checked answer, sufficient to establish a basis for exclusion for cause.” (Stewart, supra, 33 Cal.4th at p. 448, italics added.) We applied similar reasoning in finding the written comments of the other four jurors insufficient to justify disqualification. (Id. at pp. 448-449.) Further, we said that “although the poor phrasing of the juror questionnaire used in this case contributes to our conclusion that the prospective jurors were excused in violation of Witt, supra, 469 U.8. 412, 424, we note that even if the questionnaire had tracked the ‘prevent or substantially impair’ language of Witt, we still would find that the prospective jurors could not properly be excused for cause without any follow-up oral voir dire by the court.” (Id. at pp. 451-452.) Thus, a prospective juror’s answer to a single item on a questionnaire — even a question that tracks the Witt standard — is not enough to justify an excusai for cause in the absence of any instruction on the law or any additional context suggesting that the answer reliably indicates the juror’s inability to follow the law. And while it is true that “[i]n this case, unlike in Stewart, the jurors were personally questioned by the trial court” (maj. opn., ante, at p. 858), that distinction makes no difference because, as discussed *905 (ante, at p. 897), it is quite improbable that the trial court’s rote screening process on October 10 took each juror’s demeanor into account.
Our decision in People v. Wilson (2008) 44 Cal.4th 758 [80 Cal.Rptr.3d 211, 187 P.3d 1041] (Wilson) carefully applied the principles above. The prospective jurors in Wilson filled out a questionnaire that included “a long prefatory statement setting forth the basic procedure applicable to capital cases.” (Id. at p. 781.) One questionnaire item was a multiple choice question asking whether “ ‘you have ... a willingness to fairly consider whatever evidence is presented . . .’ ” during the penalty phase. (Id. at p. 783.) The trial court excluded any prospective juror who selected option (b), which said, “ ‘No matter what the evidence was, ALWAYS vote for life without possibility of parole,’ ” instead of option (c), which said, “ T would consider all the evidence and the jury instructions as provided by the court and impose the penalty I personally feel is appropriate.’ ” (Ibid.)
We held that the trial court’s exclusion of two prospective jurors for having selected option (b) was proper in context. (Wilson, supra, 44 Cal.4th at pp. 785-789.) Excluding those jurors was “consistent with the import of the questionnaire as a whole. The prefatory statement at the beginning of the section of the questionnaire concerning the death penalty [citation] gave prospective jurors the basic outline of the penalty phase procedures involved, including the need for a fair assessment and weighing of aggravating and mitigating circumstances. This written outline reinforced the trial court’s oral statement, delivered before the jurors were given the questionnaires, which provided similar background information.” (Id. at p. 788.) Further, “by checking [option (b)],” the prospective jurors “necessarily chose not to check [option (c)].” (Ibid.) “In short, a fair reading of the questionnaire demonstrates that [the prospective jurors] must have known the scope and nature of the discretion they would wield in the penalty phase, but nonetheless checked [option (b)], indicating that they would always vote for life over death irrespective of the facts and circumstances.” (Ibid., first italics added.)
In Avila, we held that the trial court properly dismissed four prospective jurors for cause based solely on their juror questionnaires. (Avila, supra, 38 Cal.4th at pp. 527-533.) The 24-page questionnaire in Avila consisted of 108 questions; “[s]everal pages . . . focused on the prospective jurors’ views concerning the death penalty.” (Id. at p. 528.) As today’s opinion notes (maj. opn., ante, at p. 857), items 97, 98, and 99 on the questionnaire “asked whether a prospective juror held such conscientious objections to the death penalty that, regardless of the evidence or the strength of proof, he or she ‘automatically’ would refuse to return a first degree murder verdict, find a special circumstance true, or impose the death penalty.” (Avila, at p. 531; see id. at p. 528, fn. 23.) What today’s opinion does not mention is that items 97, *906 98, and 99 came after item 91, which said: “ ‘One of the duties of a juror is to follow the law as it is instructed to you. Do you honestly think that you could set aside your personal feelings and follow the law as the Court explains it to you, even if you had strong feelings to the contrary?’ ” (38 Cal.4th at p. 528, fn. 23.) Crucially, our analysis of all four dismissed jurors relied on the fact that each had been informed, through item 91, that jurors have a duty to set aside their personal feelings and follow the law. (Id. at pp. 531-533 & fn. 26.) It was in that context that we found the jurors’ adherence to their personal views in answering items 97, 98, and 99 to be sufficient grounds for excusai.
Riccardi is similar. Today’s opinion focuses on question No. 68 of the juror questionnaire in Riccardi, which asked: “ ‘Do you have such an opinion concerning the death penalty that, regardless of the evidence that might be developed during the penalty phase of the trial . . . you would automatically and absolutely refuse to vote for the death penalty in any case?’ ” (Riccardi, supra, 54 Cal.4th at p. 780; see maj. opn., ante, at pp. 856-857.) But today’s opinion does not mention that Riccardi identified not only question No. 68 but also question No. 65 as “[t]he two questions most directly relevant to the Witt standard.” (Riccardi, at p. 780.) Question No. 65 “specifically called for a ‘yes’ or ‘no’ answer” to the following: “ ‘Could you set aside your own personal feelings regarding what the law ought to be and follow the law as the court explains it to you?’ ” (Ibid.) Riccardi held that “these two questions, by themselves, were ‘sufficiently clear’ such that a ‘yes’ or ‘no’ answer to each of them would ‘ “leave no doubt” ’ as to whether a prospective juror was ‘willing or able to set aside his or her personal views and follow the law.’ ” (Ibid., italics added.) As in Avila, our analysis in Riccardi upholding the dismissal of three prospective jurors relied on the fact that their responses insisted on adherence to their personal views even though question No. 65 had made clear that jurors must set aside their personal views and follow the law. (Riccardi, at pp. 781-782.)
Here, no additional question akin to item 91 in Avila or question No. 65 in Riccardi informed prospective jurors that the trial court’s initial screening question was intended to probe whether they could set aside their personal views and follow the law. Our case law applying Witt requires trial courts to do more than elicit one-word answers to a single, isolated question that neither follows nor contains any mention of jurors’ duty to follow the law.
Other courts applying Witt have taken a similar view. In State v. Sexton (Tenn. 2012) 368 S.W.3d 371, a multiple-choice item on a written questionnaire asked prospective jurors to select the answer that “ ‘best reflects your feeling about the death penalty,’ ” and it listed “ ‘Never vote for the death penalty’ ” among the options. (Id. at p. 389.) The trial court excused all *907 prospective jurors who chose that option without voir dire and without considering their answers to other questionnaire items. The Tennessee Supreme Court found this procedure inadequate to determine “whether the juror is predisposed to a certain result regardless of the law.” (Id. at p. 393.) The single question, without further context, was not “tethered to the circumstances of the case” and lacked “predictive value as to whether the prospective juror’s responses represent more than a general objection to . . . the implementation of the death penalty.” (Ibid.) In addition, several prospective jurors’ “inconsistent answers [on other questionnaire items] suggested] a level of uncertainty and highlighted] the risk that eliminating prospective jurors based solely on an answer to one written question may result in the exclusion of’ qualified jurors. (Id. at p. 395.)
In Fuselier v. State (Miss. 1985) 468 So.2d 45, the prosecutor asked the entire venire as a group, “ ‘Are there are any of you that just could not vote the death penalty no matter what the facts or what the circumstances are? No matter what?’ ” (Id. at p. 54.) A prospective juror who stood up in response to the question was dismissed for cause without voir dire. (Ibid.) The Mississippi Supreme Court held that “the failure to fully develop any voir dire regarding [the prospective juror] rendered her dismissal for cause error. A clear showing that a juror’s views would prevent or significantly impair the performance of his or her duties requires more than a single response to an initial inquiry.” (Id. at p. 55.)
Finally, in U.S. v. Chanthadara (10th Cir. 2000) 230 F.3d 1237, a prospective juror wrote on a questionnaire, “ T believe the death penalty is proper in some cases although I don’t think I would be able to vote for the death penalty in a case,’ ” and she elsewhere “clarified that this was because she didn’t feel she would ‘ever be 100% sure that [death] was the proper verdict.’ ” (Id. at p. 1271.) The Tenth Circuit held that she was wrongly excused on the basis of these answers because “she was never asked, or required to answer, whether, if the facts of the case and the evidence presented warranted imposition of the death penalty under the law, she would at least consider imposing a death sentence in light of her personal convictions. Thus, none of the questions which [the prospective juror] answered articulated the proper legal standard under Witt.” (Id. at pp. 1271-1272.)
IV.
To sum up: This is not a case where the question posed to prospective jurors tracked the language of Witt or directly asked whether they could set aside their personal views and follow the law. This is not a case where prospective jurors had been instructed on the law or on the duty of jurors to follow the law before answering what the trial court deemed a dispositive *908 question about their death penalty views. This is not a case where the trial court, in excusing prospective jurors based on one-word answers to a single initial screening question, considered each juror’s demeanor and carefully distinguished between those who did and those who did not need to be questioned further. And this is not a case where we need to speculate on the infirmity of the initial screening question posed by the trial court. For we know that the question was inadequate to disqualify three of the nine prospective jurors whom the trial court screened on October 14 using questions different from the one it posed to all 16 jurors who stood up on October 10. And we know that two of the three jurors who survived the initial screening turned out to be qualified to serve on this capital jury.
As this court has unanimously observed: “When first called to the capital venire, prospective jurors frequently know little about death penalty law and procedure and have reflected little on their own attitudes; their responses often change between the questionnaire and voir dire as well as during examination.” (People v. Brasure (2008) 42 Cal.4th 1037, 1053 [71 Cal.Rptr.3d 675, 175 P.3d 632].) In the same opinion, we called it “a desirable form of education for a prospective juror” to learn “what their duty would be should they serve as penalty phase jurors.” (Ibid.) In this case, it is unclear why the trial court, at the outset of its screening process, did not give prospective jurors the brief overview of California’s death penalty law that it gave before full voir dire. What is clear is that the trial court’s October 10 screening process provided no such “education” (ibid.), nor did it elicit from each prospective juror a considered judgment as to whether he or she could follow the law. Because the trial court erroneously excused 16 prospective jurors for cause, I respectfully dissent from the court’s affirmance of the death judgment.
I join the portions of today’s opinion affirming defendant’s convictions and rejecting his noncapital sentencing claims.
Peña, J.,* concurred.
APPENDIX TO CONCURRING AND DISSENTING OPINION
First panel — October 10, 1997
“THE COURT: As I started to say, one of the charges against Mr. Capistrano in this case is murder, and it’s alleged that it’s murder in the first degree.
*909 “It’s further alleged that due to the manner in which the murder was committed, that special circumstances exist.
“If the jury in this case finds Mr. Capistrano guilty of murder in the first degree, and further finds that the special circumstances allegation is true, the jury in this case will be asked to determine the penalty in this case.
“The jury will have two options, and two options only, and that will be life without the possibility of parole, that will be life in prison, or death.
“The reason I’m mentioning that is this: Now, without knowing anything at all about this case, is there any juror sitting in the audience right now that, regardless of what the evidence might be, has such feelings about the death penalty that he or she would be unable to vote to impose the death penalty in this case?
“If the answer is yes, if you’d rise, please.
“I need to know your name.
“PROSPECTIVE JUROR [C.M.]: [C.M.]
“THE COURT: Miss [M.], that is regardless of what the evidence is; is that correct?
“PROSPECTIVE JUROR [C.M.]: Yes.
“THE COURT: All right. You are excused. Thank you.
“Your name, sir?
“PROSPECTIVE JUROR [S.C.]: [S.C.]
“THE COURT: And Mr. [C.], that is regardless of the evidence; is that correct?
“PROSPECTIVE JUROR [S.C.]: Yes.
“THE COURT: You are excused.
“[DEFENSE COUNSEL]: Your Honor, for purpose of the record, we ask that the jurors not be excused, object to their being excused, and ask in the alternative that they be allowed to participate in a pool of jurors that determine the guilt phase, at least, of the trial.
*910 “THE COURT: Your objection is noted and overruled.
“Your name, ma’am?
“PROSPECTIVE JUROR [D.G.]: [D.G.]
“THE COURT: Miss [G.], your answer is that you would be unable to vote to impose the penalty of death, regardless of the evidence?
“PROSPECTIVE JUROR [D.G.]: Yes.
“THE COURT: You are excused. Thank you.
“And you, Miss [O.]?
“PROSPECTIVE JUROR [K.O.]: Yes.
“THE COURT: And your answer would be the same?
“PROSPECTIVE JUROR [K.O.]: Yes, sir.
“THE COURT: Regardless of the evidence, you would be unable to vote to impose the punishment of death?
“PROSPECTIVE JUROR [K.O.]: Yes. I just don’t believe in the death penalty.
“THE COURT: Thank you. You are excused.
“PROSPECTIVE JUROR [K.O.]: Thank you.
“PROSPECTIVE JUROR [A.U.]: [A.U.]
“THE COURT: Miss [U.], regardless of the evidence in this case, you would be unable to vote to impose the punishment of death; is that correct?
“PROSPECTIVE JUROR [A.U.]; Correct.
“THE COURT: And that would be in any case; is that correct?
“PROSPECTIVE JUROR [A.U.]: Right.
“THE COURT: You are excused, as well.
“PROSPECTIVE JUROR [A.U.]: Thank you, sir.
*911 “THE COURT: And you, as I recall, are Miss [A.].
“PROSPECTIVE JUROR [C.A.]: Yes.
“THE COURT: And you would be unable to vote to impose the punishment of death in any case; is that correct?
“PROSPECTIVE JUROR [C.A.]: Yes.
“THE COURT: Regardless of the evidence?
“PROSPECTIVE JUROR [C.A.]: Yes.
“THE COURT: You are excused, as well.
“Your name, ma’am?
“PROSPECTIVE JUROR [J.W.]: [J.W.]
“THE COURT: Miss [W], you would be unable to vote to impose the death penalty in this case or any case, regardless of the evidence; is that correct?
“PROSPECTIVE JUROR [J.W.]: Yes.
“THE COURT: You are excused, as well. Thank you.
“In the back row, your name, please?
“Excuse me, the second row.
“PROSPECTIVE JUROR [T.L.]: [T.L.]
“THE COURT: Miss [L.], you would be unable to vote to impose the punishment of death in this case, regardless of the evidence?
“PROSPECTIVE JUROR [T.L.]: That is correct, sir.
“THE COURT: You are excused.
“THE CLERK: That was [T.L.]?
“THE COURT: [Repeats Prospective Juror TJL’s name.]
*912 “PROSPECTIVE JUROR [T.L.]: [Spells name.]
“THE COURT: Thank you.
“And the lady next to her?
“PROSPECTIVE JUROR [Z.M.]: [Z.M.]
“THE COURT: Yes. And you would be unable to impose the punishment of death in this case or any case, regardless of the evidence?
“PROSPECTIVE JUROR [Z.M.]: Yes.
“THE COURT: Thank you.
“And finally, your name, ma’am?
“PROSPECTIVE JUROR [A.S.]: [A.S.]
“THE COURT: And Miss [S.], you would be unable to vote to impose the — actually, I should say you would be unwilling to impose the death penalty in this case or any case, regardless of the evidence?
“PROSPECTIVE JUROR [A.S.]: Yes.
“THE COURT: Thank you. You are excused, also.”
* *
Second panel — October 10, 1997
“THE COURT: All right. The defendant in this case, ladies and gentlemen, is Mr. John Leo Capistrano. I’m not going to tell you too much about this case, for reasons that will be obvious in just a moment.
“I should tell you that Mr. Capistrano is charged with having committed a number of different felony offenses. One of those is the crime of murder in the first degree.
“It is alleged also that because of the manner in which the killing occurred, that special circumstances exist in this case.
*913 “If the jury that is selected in this case returns a verdict of guilty of murder in the first degree, and further finds that the special circumstances are true, the jury will then be called upon to determine the penalty in this case.
“The jury will have two options and two options only. That will be the penalty of life in prison without the possibility of parole, or the penalty of death.
“Now, people do tend to have strong opinions when it comes to the death penalty, and people are certainly entitled to have those opinions, and no such opinion is right or wrong, but we do need to find out what your feeling is in general on the death penalty before we can proceed any further, so I’m going to ask you first the following couple of very general questions.
“The first question is this:
“Because of your feelings about the death penalty in general, is there anyone who would be unable to vote to impose the punishment of death in this case or in any case, regardless of the evidence?
“If the answer is yes, if you’d rise.
“PROSPECTIVE JUROR: Would you say that again?
“THE COURT: Would you be unable to vote to impose the punishment of death in this case or in any case, regardless of the evidence?
“All right. Let’s start with the lady in the — I guess that’s the second row, in blue.
“Your name, please?
“PROSPECTIVE JUROR [A.W.]: I just don’t believe—
“THE COURT: I need your name.
“PROSPECTIVE JUROR [A.W.]: [A.W.]
“THE COURT: And Miss [W.], you would be unable to impose the death penalty in this case or any case, regardless of the evidence; is that correct?
“PROSPECTIVE JUROR [A.W.]: Yes.
“THE COURT: You are excused. Thank you.
*914 “I assume you’re making the same objection as before?
“[DEFENSE COUNSEL]: Yes.
“THE COURT: Made and overruled.
“And your name in the back?
“PROSPECTIVE JUROR [Y.B.]: [Y.B.]
“THE COURT: Miss [B.], you would be unable to vote to impose the death penalty in this case or any case, regardless of the evidence, because of your feeling about the death penalty?
“PROSPECTIVE JUROR [Y.B.]: Yes.
“THE COURT: You are excused. Thank you.
“You are Mr. [N.]?
“PROSPECTIVE. JUROR [E.N.]: That is correct, your Honor.
“THE COURT: Mr. [N.], you would be unable to vote to impose the death penalty in this case or any case, regardless of the evidence, because of your feelings about the death penalty?
“PROSPECTIVE JUROR [E.N.]: That is correct.
“THE COURT: You are excused, as well.
“PROSPECTIVE JUROR [J.S.]: [J.S.] [Spells name.]
“THE COURT: And your answer would be the same, Miss [S.]?
“PROSPECTIVE JUROR [J.S.]: Yes.
“THE COURT: You would be unable to impose — vote to impose the death penalty in this case or any case, regardless of the evidence, because of your feelings about the death penalty in general?
“PROSPECTIVE JUROR [J.S.]: Yes.
“THE COURT: You are excused, as well.
“In the back row?
*915 “PROSPECTIVE JUROR [MJ.]: [M.J.]
“THE COURT: Miss [J.], would your answer be the same?
“PROSPECTIVE JUROR [MJ.]: Yes, it would.
“THE COURT: You would be unable to — you would be unwilling, I should say, to vote to impose the death penalty in this case or any case, regardless of the evidence, because of your feelings about the death penalty in general?
“PROSPECTIVE JUROR [MJ.]: That is correct.
“THE COURT: You are excused.
“And your name?
“PROSPECTIVE JUROR [L.E.]: [L.E.]
“THE COURT: Miss [E.], you would be unwilling to vote to impose the death penalty in this case or any case, regardless of the evidence, because of your feelings about the death penalty, in general?
“PROSPECTIVE JUROR [L.E.]: Yes, sir.
“THE COURT: You are excused, as well. Thank you.”
* * *
Third panel — October 14, 1997
“THE COURT: Ladies and gentlemen, the defendant in this case is accused of having committing [íz'c] a number of different felony offenses. One such offense is the crime of murder, murder in the first degree.
“If the jury in this case finds the defendant, whose name is John Capistrano, guilty of murder in the first degree, further finds that special circumstances exist, then the jury will have to determine the penalty in this case, and the jury will have two and two options only, and that will be life imprisonment without the possibility of parole or the penalty of death.
“Persons do tend to have strong opinions one way or the other about the death penalty. There is nothing wrong about having such opinions, but I do need to find out a little bit about those opinions at this time.
*916 “Now, if there are any of you who have such strong feelings about the death penalty law in general that you would be unable to impose the punishment of death in this case or in any case, regardless of the evidence, would you stand, please?
“All right. Beginning with the gentleman on my left, your name, sir? “PROSPECTIVE JUROR [J.L.]: [J.L.], [spells name],
“THE COURT: All right. I’ve found you.
“PROSPECTIVE JUROR [J.L.]: I am just against the death penalty.
“THE COURT: Regardless of the circumstances of the case? “PROSPECTIVE JUROR [J.L.]: Yes, sir.
“THE COURT: Regardless of the evidence?
“PROSPECTIVE JUROR [J.L.]: Yes, sir.
“THE COURT: There is no possible case that you would vote to impose the death penalty on?
“PROSPECTIVE JUROR [J.L.]: Yes, sir.
“THE COURT: All right. Sir, you are excused. Thank you.
“Ma’am, you stood up a little late, so I’ll come back to you.
“Your name?
“PROSPECTIVE JUROR [G.L.]: [G.L.]
“THE COURT: Your last name again?
“PROSPECTIVE JUROR [G.L.]: [Spells name],
“THE COURT: All right, ma’am.
“PROSPECTIVE JUROR [G.L.]: I am strongly against the death penalty. I’m against it.
“THE COURT: In any case?
*917 “PROSPECTIVE JUROR [G.L.]: In any case. Life imprisonment, I’m okay; but death, I’m against it.
“THE COURT: So you would be unable to vote to impose the death penalty in this case or in any case; is that right?
“PROSPECTIVE JUROR [G.L.]: Yes.
“THE COURT: Regardless of the evidence?
“PROSPECTIVE JUROR [G.L.]: Yes, sir.
“THE COURT: Is that yes?
“PROSPECTIVE JUROR [G.L.]: Yes, sir.
“[DEFENSE COUNSEL]: Your Honor, our position would be the same as previously stated.
“THE COURT: I assumed that.
“All right. Miss [L.], thank you.
“You are excused, also.
“Your name?
“PROSPECTIVE JUROR [L.W.]: [L.W.], [spells name],
“THE COURT: [L.W.], Jr., yes, sir.
“PROSPECTIVE JUROR [L.W.]: I’m opposed to it because back in ’76 my brother was convicted of murder in the first degree.
“THE COURT: So you would be unable to impose the punishment of death in this case or any case?
“PROSPECTIVE JUROR [L.W.]: Any case, yes, sir.
“THE COURT: Regardless of the evidence or circumstances? “PROSPECTIVE JUROR [L.W.]: Yes, sir.
“THE COURT: Is that right?
*918 “PROSPECTIVE JUROR [L.W.]: Yes, sir.
“THE COURT: You could not even conceive of an instance where you would vote to impose the death penalty?
“PROSPECTIVE JUROR [L.W.]: No, no, sir.
“THE COURT: Sir, thank you. You are excused.
“Your name, ma’am?
“PROSPECTIVE JUROR [R.C.]: My name is [R.C.].
“THE COURT: [Repeats name]?
“PROSPECTIVE JUROR [R.C.]: Yes. I am against the death penalty.
“THE COURT: So you could not vote to impose the death penalty in this case or in any case?
“PROSPECTIVE JUROR [R.C.]: No, sir.
“THE COURT: Regardless of the evidence?
“PROSPECTIVE JUROR [R.C.]: No, sir.
“THE COURT: Regardless of the circumstances?
“PROSPECTIVE JUROR [R.C.]: No, sir.
“THE COURT: You could not even conceive of a case where you would vote to impose the death penalty?
“PROSPECTIVE JUROR [R.C.]: No, sir.
“THE COURT: You are excused. Thank you.
“Okay. Ma’am, in the front row.
“PROSPECTIVE JUROR [N.H.]: ... [1] I’m vegetarian. I don’t even — I went fly fishing in the summer, and a fish died, and I cried, so no, there is no way I could even consider anything like that.
“THE COURT: Have you given this subject any thought before right now?
*919 “PROSPECTIVE JUROR [N.H.]: When the fish died, and I cried, it was spontaneous. I realized then that I can’t even enjoy fish, so I don’t want to be a part of this.
“THE COURT: You couldn’t conceive of an instance so terrible that you would vote to impose the death penalty?
“PROSPECTIVE JUROR [N.H.]: No, not at all.
“THE COURT: So you couldn’t vote to impose it in this case or any case? “PROSPECTIVE JUROR [N.H.]: Everything has a right to live.
“THE COURT: Regardless of the evidence?
“PROSPECTIVE JUROR [N.H.]: Regardless.
“THE COURT: Under no circumstances?
“PROSPECTIVE JUROR [N.H.]: No circumstances.
“THE COURT: You are excused, as well, Miss [H.] Thank you.
“And your name?
“PROSPECTIVE JUROR [E.S.]: [E.S.]
“THE COURT: [G.S.]?
“PROSPECTIVE JUROR [E.S.]: [K], [spells first name],
“THE COURT: Okay, I see.
“PROSPECTIVE JUROR [E.S.]: I’m against it, so maybe I would be able to voice my opinion on that.
“THE COURT: You couldn’t conceive of any instance where you would vote to impose the death penalty?
“PROSPECTIVE JUROR [E.S.]: I don’t think so.
“THE COURT: No crime could be horrible enough for you to do that?
*920 “PROSPECTIVE JUROR [E.S.]: I don’t think so. I just — I guess because of my religion, that let everything have that have breath praise the Lord, and I’m just against it.
“THE COURT: I’m having a hard time hearing you. Because of your religion?
“PROSPECTIVE JUROR [E.S.]: I said everything that has breath praise the Lord, and I — I just couldn’t be the one to say yes.
“THE COURT: So you could not vote to impose that penalty in this case or any case?
“PROSPECTIVE JUROR [E.S.]: No.
“THE COURT: Regardless of the evidence?
“PROSPECTIVE JUROR [E.S.]: No.
“THE COURT: Regardless of the circumstances?
“PROSPECTIVE JUROR [E.S.]: No.
“THE COURT: You couldn’t even conceive of a case where you would think that a death penalty would be appropriate?
“PROSPECTIVE JUROR [E.S.]: No, not for murder, no.
“THE COURT: Is there some other crime that you would think would be appropriate?
“PROSPECTIVE JUROR [E.S.]: Might be a possibility, but not murder, no.
“THE COURT: What crime would you think would be appropriate?
“PROSPECTIVE JUROR [E.S.]: In my case, maybe like a misdemeanor or something like that, something that’s not real bad.
“THE COURT: So you think that the death penalty would be appropriate for some lesser crime?
“PROSPECTIVE JUROR [E.S.]: Uh-huh, death penalty, yes.
*921 “THE COURT: I think we’ll have to talk to you some more, so have a seat, sit down.”
* * *
Fourth panel — October 14, 1997
“THE COURT: All right. Ladies and gentlemen, I’m not going to tell you very much about this case, because in order for you to answer the first series of questions concerning your qualifications to serve as jurors, you don’t need to know anything about the case, other than to tell you that the defendant in this case, Mr. John Capistrano, is facing a number of felony charges in this case.
“One of them is the charge of murder in the first degree.
“Now, if the jury in this case returns a verdict of guilty of murder in the first degree, and further finds that the special circumstances that are alleged against Mr. Capistrano are true, there will then be a penalty phase in this case, in which the jury will be asked to determine the punishment.
“The jury will have two options and two options alone: life without the possibility of parole, life in prison, that is, without the possibility of parole, or death, so this is a death penalty case.
“Now, there are persons who have strong feelings about the death penalty in the State of California, and there is nothing wrong with having such opinions, but I need to know what those opinions are.
“So I’ll ask you first if any of you have such strong feelings about the death penalty that you would be unable to vote to impose the punishment of death in this case or in any other case, regardless of the evidence or the circumstances?
“If your answer to that is yes, if you would stand.
“All right. Let’s start with you, sir.
“PROSPECTIVE JUROR [E.B.j: [E.B.j
“THE COURT: Yes, sir?
“PROSPECTIVE JUROR [E.B.j: I could not participate in a jury that would be asked to impose death in any case.
*922 “THE COURT: So you could not conceive of a case where the death penalty might be appropriate?
“PROSPECTIVE JUROR [E.B.]: I could conceive — I could conceive of a case, but I don’t know that I’d want — I—I don’t know that I would want to be part of that case.
“THE COURT: Well, I think we’re going to need to ask you some more questions about that.
“Have a seat.
“Your name?
“PROSPECTIVE JUROR [AM.]: [A.M.]
“THE COURT: What was your name again?
“PROSPECTIVE JUROR [A.M.]: [Repeats name.]
“THE COURT: Yes, there you are. I’m sorry.
“PROSPECTIVE JUROR [AM.]: I can conceive of someone doing something wrong where people would consider that he deserved death. I don’t— I’m against the death penalty.
“THE COURT: In general?
“PROSPECTIVE JUROR [A.M.]: Flat out.
“THE COURT: So you could not conceive of a case where the death penalty might be warranted?
“PROSPECTIVE JUROR [A.M.]: My heart is racing just thinking about deciding to make that judgment.
“THE COURT: So are you indicating to me then that you could not vote to impose the death penalty in this case or in any other case, regardless of the evidence or circumstances?
“PROSPECTIVE JUROR [A.M.]: No.
“Life imprisonment without the possibility of parole; death, no.
*923 “THE COURT: So your answer to my question is you could not vote to do that?
“PROSPECTIVE JUROR [A.M.]: I could not vote for the death penalty.
“THE COURT: Under any circumstances?
“PROSPECTIVE JUROR [A.M.]: Under any circumstances.
“THE COURT: Appreciate your letting me know that, Miss [M.]. You are excused. Thank you.
“Your name, ma’am?
“PROSPECTIVE JUROR [L.T.]: [L.T.]
“THE COURT: Yes.
“PROSPECTIVE JUROR [L.T.]: I would not like to be the one to decide on taking a person’s life.
“THE COURT: Well, you wouldn’t be the only one. It would be twelve jurors who would have to agree.
“PROSPECTIVE JUROR [L.T.]: I—
“THE COURT: So you would not want to participate?
“PROSPECTIVE JUROR [L.T.]: No.
“THE COURT: Could you conceive of a case that would be so horrendous that you would vote to impose the death penalty?
“PROSPECTIVE JUROR [L.T.]: Yes.
“THE COURT: So depending on the circumstances or the evidence, you might be willing to vote to impose it?
“PROSPECTIVE JUROR [L.T.]: Yes.
“THE COURT: Okay. Have a seat.”

 Associate Justice bf the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.